**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JOHN DOE BY AND THROUGH
A.W., and A.W.

Plaintiffs,

v. Case No: 8:23-cv-1772-CEH-AAS

HERNANDO COUNTY SCHOOL
BOARD, et al.,

Defendant.

---

# ORDER

This matter comes before the Court on Defendants' Motions for Summary Judgement (Docs. 132, 136), which Plaintiffs oppose (Doc. 141, 142).[1]

In this disability discrimination action, Plaintiffs allege, *inter alia*, that Defendant Hernando County School Board ("HCSB" or "the school district") discriminated and retaliated against Plaintiffs John Doe and A.W. because of John Doe's disability. Doc. 123. Plaintiffs also allege that the HCSB's negligence caused John Doe to sustain physical and emotional injuries. *Id.*

Upon review and consideration, and being fully advised in the premises, the Court will grant Defendant's Motion for Summary Judgment (Doc. 136) because there

[1] Plaintiffs are strongly encouraged to review the local rules of the Court to which they submit motions, briefs, and other filings. Pursuant to FLMD Rule 3.01(c), the response to a motion must be no longer than 20 pages. Pursuant to FLMD Local Rule 1.08(a), margins should be 1 inch, and the main text should be at least 13-point font with 2.0 doubled-spacing.

exists no genuine issue of material fact, and Defendant is entitled to judgment as a matter of law. Further, the Court will decline to extend supplemental jurisdiction to the Plaintiffs' state law claims.

## I. FACTUAL BACKGROUND[2]

A.W. is the mother of John Doe ("John"). Doc. 146 ¶ 4. At the time of the relevant incidents, John was approximately eight years old. Doc. 146 ¶ 5. On December 9, 2021, Hernando County School District developed an Individualized Education Plan ("IEP") for John identifying his disabilities and necessary accommodations. Doc. 146 ¶ 6.

During the relevant time period, Ms. Sarran was John's second-grade teacher. Doc. 146 ¶ 7. Ms. Sarran has taught since 2005, and she has taught special needs classes at Explorer K-8 exclusively since 2020. Doc. 146 ¶¶ 2,3. Andrew Macgregor ("AP MacGregor") was an assistant principal at Explorer K-8 during the relevant time period. AP MacGregor's job responsibilities included, among other things: running the school and assisting the principal with her efforts and vision. Doc. 142-6 at 16:11-17:2. Both Ms. Sarran and AP MacGregor knew that John had an IEP and disabilities when the school year began. Doc. 146 ¶ 8. Further, A.W. personally informed staff, including Ms. Sarran, that John had a seizure disorder, needed breaks, and struggled with frustration regulation. Doc. 146 ¶ 9.

---

[2] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including exhibits, and the Stipulation of Agreed Material Facts (Doc. 146). For purposes of summary judgment, the Court considers the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

Using their own personal devices, school district employees recorded John. Doc. 146 ¶ 10. Specifically, on August 12, 2022, Paraprofessional Quennie Bond recorded one of John's behavioral outbursts using her personal phone. Doc. 142-5 at 119:18-120:4. Paraprofessional Bond's footage of John remained on her phone for approximately two years. Doc. 142-5 at 120:10-12. Ms. Sarran did not know that her assistant was filming John's behavior until the parties attended mediation approximately two years later. Doc. 142-5 at 119:18-120:12. A.W. testified she did not consent to school staff recording John's behavioral outbursts. Doc. 142-4 at 231:21-24; 232:7-8. However, the authorization form clearly shows that by way of her signature, A.W. gave permission to HCSB to use and publish photographs and video recordings of John. Doc. 134-13. The authorization form does not contain any language stating that the permitted use of the photographs and videos of John is limited to use for school events, class photographs, or performances, and not for the purpose of recording behavioral episodes. *Id.*

A discipline referral is a document that is used to memorialize a student's behavioral incident or other violation of the Student Code of Conduct, and it is used as a form of progressive discipline. Doc. 146 ¶ 11. Moreover, anytime a teacher is hit or kicked, or a student otherwise breaks the Student Code of Conduct, protocol requires that a referral be generated to document the incident. Doc. 142-6 at 25:9-19. The referring person documents the incident, and the administrative staff overseeing the disciplinary action signs the referral. Doc. 146 ¶ 12. HCSB referral procedures require the administrator overseeing discipline for the day to sign referrals. Doc. 134-

3 at 37:7-20. There is a space for the student to sign the referral. *Id.* at 37:21-38:23. HCSB employees attempt to obtain the student's signature, but the student's signature is not required. *Id.* HCSB also tries to obtain the parent's signature on the referral, but parents are not required to sign referrals. *Id.* at 39:8-17. It is possible that a referral may be placed in a student's file without a parent's or student's signature. *Id.* at 39:18-22.

John received eleven referrals while at Explorer K-8, and the referrals were placed in Doe's file. Doc. 146 ¶ 13,15; Doc. 135-17 at 1569. John signed four out of the eleven referrals, dated August 11, 12, 16, and 18, 2022. Doc. 146 ¶ 14. Each referral regarding John signed by AP MacGregor or Ms. Sarran concerned a behavioral incident. *See* Doc. 123-4; Doc. S-135-2 at 2-8, 10; Doc. 134-11 at ¶ 4; Doc. 134-12 ¶ 4.

SROs[3] are employed by the Hernando County Sheriff's Office ("Sheriff's Office"). Doc. 134-3 at 26:3-17; Doc. 134-6 at 36:25-37:1. The SRO prepares "incident reports" pursuant to the policies and procedures espoused by the Sheriff's Office. Doc. 146 ¶ 16; *See also* Doc. 134-3 at 26:3-17; Doc. 134-6 at 36:25-37:1; Doc. 134-6 at 38:23 – 39:4 and 44:5-10. No HCSB employee filed a police report against John with the Sheriff's Office. Doc. 134-7 at 8.

Pursuant to the school's policy and Florida Statute §1003.573, after restraint is used on a disabled student, an incident report must be provided to the student's parent within 3 school days. Doc. 142-9 at 1.

[3] The Court assumes "SRO" to be an initial for "School Resource Officer."

On the morning of August 11, 2022, John became upset during an assignment in Ms. Sarran's class. Doc. 146 ¶ 17. As a result, Ms. Sarran called for assistance because she needed to get the other children to lunch. Doc. 146 ¶ 18. AP MacGregor placed John in a physical restraint. Doc. 146 ¶ 19; *see also* Doc. 142-8, "Involuntary Examinations and Restraint and Seclusion (IERS) RESTRAINT Incident Report." Both AP MacGregor and AP Katie Reynolds completed restraint incident reports. Doc. 142-8; Doc. 142-9. Neither of the restraint incident reports explicitly state that John hit his head on a desk. *Id.* However, AP MacGregor's report indicates that John was at risk of immediate physical harm. Doc. 142-8 at 2. Moreover, AP Reynold's report specifies that John's "behavior put himself…[at] serious risk of injury." Doc. 142-9 at 2. A.W. testified that HCSB employees held John on the ground, were on his back, stepped on his finger, and twisted his ear. Doc. 134-9 at 129:17-131:25.

While looking for John's planner in preparation to call his mother, a behavioral specialist found a box cutter in John's backpack. Doc. 134-1 at 164:22-165:11 and 167:3-168:5. John was not present in the classroom when his backpack was searched[4][5].

[4] Plaintiffs are reminded that it is the parties' responsibility to provide the Court with correct pincites. ("Both the movant and the party opposing summary judgment shall provide pinpoint citations to the pages and lines of the record supporting each material fact.") Doc. 51, Case Management and Scheduling Order, at 7; *See also Chavez v. Sec'y Fla. Dept. of Corr.,* 647 F.3d 1057, 1061 (11th Cir. 2011)("Making district courts dig through volumes of documents and transcripts would shift the burden of sifting from [the parties] to the courts. With a typically heavy caseload and always limited resources, a district court cannot be expected to do [a litigant's] work for him."); *A.L.,* 635 F. App'x at 786-87 ("District court judges are not required to ferret out delectable facts buried in a massive record.") (citation modified).

[5] The deposition excerpt to which Plaintiffs cite (Doc. 142-6 at 41:12-42:19) does not support Plaintiffs' proposition that AP MacGregor testified that John was not in the classroom when

Doc. 142-6 at 57:21-58:15. Ms. Sarran testified she did not place the box cutter in John's backpack and she did not see any HCSB employee plant the box cutter. Doc. 134-11 at 1. A.W. testified she packed John's backpack that morning and "knew for a fact" there was no box cutter in his backpack that morning. Doc. 142-4 at 147:16-22. However, A.W. also testified that allegations that Ms. Sarran or AP MacGregor planted the box cutter were her assumptions and she has no personal knowledge of where the box cutter came from. Doc. 134-9 at 152:9-20. According to the HCSB Student Code of Conduct, possession of a boxcutter may result in expulsion, a 1-year placement at an alternative school, or 10 days out of school suspension or expulsion. Doc. 134-5 at 10, 42 of 71.

It is against school protocol for a student to injure his head earlier in the day but not be checked out by the school nurse until 3:30pm. Doc. 142-6 at 39:1-39:13. MacGregor does not recall the time of day John's head injury occurred. Doc. 142-6 at 35:4-12. John was sent to the school's clinic at 3:30pm, near the end of the day. Doc. 123-3, Exhibit C, at 2; Doc. 142-6 at 38:21-25.

On September 12, 2022, John ran out of Ms. Sarran's classroom, prompting Ms. Sarran to call for help. Doc. 146 ¶ 25.

---

the backpack was searched. Instead, AP MacGregor discusses the box cutter incident at Doc. 142-6 at 57:21-58:15. Even after reviewing the correct excerpt of AP MacGregor's testimony where he discusses the moment he found the box cutter, it is not unequivocally clear whether or not John was in the classroom at the precise time when his backpack was searched. *See* Doc. 142-6 at 57:21-58:15. However, HCSB did not contest John's location at the time of the backpack search. Therefore, viewing the evidence in the light most favorable to the non-moving party (i.e., Plaintiffs), the Court accepts that John was not in the classroom when the box cutter was found in his backpack.

Regarding the abuse allegations, John testified "he was hitting me from the stick or from my back and my head." Doc. 142-3 at 10:22-11:8. However, John later testified he does not know if it was a man or woman who hit him, and there is record evidence that Ms. Sarran is the individual who hit John with the stick. Doc. 142-3 at 11:4-5; Doc. 142-4 at 115:23-25; 116:20-23. There is record evidence that AP MacGregor and/or Ms. Sarran struck John with a stick. *See e.g.,* Doc. 132-7 at 10:25-12:13; Doc. 134-9[6] at 125:3-12; 132:23-133:2; 137:17-138:24; 154:20-24. Viewing the evidence in the light most favorable to A.W., a jury could infer that A.W. conducted a meeting with AP MacGregor and Ms. Sarran to discuss John being hit with a stick. *See* Doc. 134-9 at 104:4-7.

The HCSB procedure for investigating an allegation of abuse by a teacher against a student is as follows. Doc. 134-6 at 54:17-56:15. First, the principal or assistant principal performs an internal investigation. *Id.* If a principal or assistant principal is implicated in the allegation, then her supervisor, another principal, or another assistant principal would conduct the investigation. *Id.* The investigation should be documented by having someone annotate and take summaries of the meetings. *Id.* The principal or assistant principal conducting the investigation makes

[6] This deposition testimony is inadmissible hearsay. Although it is atypical to consider inadmissible hearsay on a motion for summary judgment, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form. The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-1294 (11th Cir. 2012). Here, A.W.'s testimony that John told her he was hit with a stick can be reduced to admissible form if John testifies. *See* Doc. 132-7 at 10:25-12:13 (John's deposition testimony that a woman hit him with a stick).

the final determination as to whether or not the allegations are substantiated. *Id.* Moreover, during the investigation the individual conducting the investigation would also consult with Matthew Goldrick, since he is the supervisor of professional standards and director of human resources. *Id.*

On August 12, 2022, A.W. met with AP MacGregor to discuss John's allegation that, on the day prior, Sarran and AP MacGregor hit John with a stick. Doc. 134-9 at 104:5-7. On August 19, 2022, A.W. escalated her complaint to the District to complain that AP MacGregor and the school staff were not following John's IEP and that AP MacGregor hit John in his head with a stick. Doc. S-135-5 at 20. On August 19, 2022, Amanda Bigwood, the Explorer K-8 Staffing Specialist, proposed that an IEP meeting take place on August 22, 2022. Doc. 146 ¶ 22; Doc. S-135-5 at 22. Specifically, Staffing Specialist Bigwood called A.W. offered a date on which to conduct the meeting, provided A.W. with contact information to schedule an IEP meeting, and sent A.W. a follow-up email. *See* Doc. S-135-5 at 22. However, A.W. declined the staffing specialist's offer to initiate an IEP meeting. Doc. S-135-5 at 22. Instead, A.W. informed that she would initiate the IEP meeting when she was ready to do so. *Id.*

On August 23, 2022, A.W. sent an email to the school district informing of an incident that occurred earlier that day when A.W. picked John up from school after he had a "meltdown." Doc. S-135-5 at 30-32; Doc. 134-10 at 26:21-27:15. A.W. explained that while they were leaving the school, John told A.W. that "they" pulled his ear, bent his finger back, stepped on his feet, choked him, and hit him in the head

with a stick. Doc. S-135-5 at 30-32. In response to A.W.'s August 23rd email, Principal Braithwaite conducted an internal investigation into A.W.'s complaints. Doc. 134-10 at 18:15-22:15; 26:21-27:19. Principal Braithwaite conducted the investigation under the auspices of the HCSB's Supervisor of Professional Standards and Director of Human Resources. Doc. 134-6 at 54:17-56:15. Principal Braithwaite conducted documented interviews with A.W., as well as with witnesses to the incidents, namely: Ms. Reynolds, Paraprofessional Julie Jones, Paraprofessional Quennie Bond, Ms. Sarran, AP MacGregor, and SRO Angel Lara. Doc. 134-10 at 18:15-22:15; 26:21-27:19. Due to John's disability, Principal Braithwaite decided not to interview John. *Id.* at 17:25-18:14. Ultimately, Principal Braithwaite concluded A.W.'s allegations were unsubstantiated. Doc. ¶ 146 24; Doc. S-135-5 at 1.

A.W. complained, via email, to the school district about the alleged mistreatment John was enduring at Explorer K-8 on August 23, 2022 and August 24, 2022. Doc. S-135-5 at 25-31. A.W. eventually attended an IEP meeting with Explorer K-8 staff on September 19, 2022. Doc. 134-9 at 105:5-106:2. The IEP meeting that occurred on September 19, 2022 was not the initial IEP meeting, as there was already an IEP in place for John. Doc. 146 ¶ 6; Doc. 134-9 at 90:25-92:14; *See also* Doc. S-135-5 at 20.

A.W. testified AP MacGregor retaliated against her by calling DCF. Doc. 134-9 at 159:15-19. The DCF investigation began on September 14, 2022, and the accompanying DCF report names both A.W. and John. *See* Doc. 142-10. Ms. Sarran

and AP MacGregor deny making a report to DCF. Doc. 146 ¶ 27; *See also* Doc. 134-8, Interrog. Answer No. 10. A.W. testified she does not know exactly who reported to DCF that she choked John (Doc. 134-9 at 161:12-16), but, based on the content of the reports, she believes it was either Principal MacGregor or Ms. Sarran. Doc. 134-9 at 161:3-162:11. AP MacGregor testified that according to process and protocol, an HCSB employee should call DCF when a child brings a box cutter to school. Doc. 142-6 at 77:1-78:13. In fact, AP MacGregor testified that it was likely a HCSB employee—and maybe even himself—who initiated the DCF report, since doing so would have been the appropriate protocol. Doc. 142-6 at 76:1-77:13.

## II. LEGAL STANDARD

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2). In determining whether a genuine issue of material fact exists, the Court must consider all the evidence in the light most favorable to the nonmoving party. *See Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003). Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. *Id.*

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "Only when that burden has been met does the burden shift to the non-moving party." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

"[I]n order to survive summary judgment, the nonmoving party must set forth specific facts showing there is a genuine issue for trial." *Johnson v. New Destiny Christian Ctr. Church, Inc.*, 826 F. App'x 766, 770 (11th Cir. 2020), citing *Anderson*, 477 U.S. at 249-50. "[U]nsupported 'conclusory allegations' do not suffice." *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 596 (11th Cir. 2019). Likewise, the "'mere existence of a scintilla of evidence' cannot suffice to create a genuine issue of material fact." *Johnson*, 826 F. App'x at 770, quoting *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

The Court will first address Defendant Hernando County School Board's Motion for Summary Judgment (Doc. 136). It will then turn to Defendants Sabreena Sarran's and Andrew MacGregror's Motion for Summary Judgment (Doc. 132).

In their Fourth Amended Complaint, Plaintiffs bring claims against HCSB for disability discrimination under the Americans with Disability Act (Count 3) and §504

of the Rehabilitation Act (Count 4); negligence (Counts 5 and 6); retaliation under the Americans with Disabilities Act (Count 9) and §504 of the Rehabilitation Act (Count 10); and failure to prevent disability discrimination under both §504 of the Rehabilitation Act (Count 11) and the Americans with Disabilities Act (Count 12). Doc. 123. Defendant HCSB has moved to dismiss Counts 3 – 6 and Counts 9 – 12.

**A. <u>Discrimination Claims under the ADA (Count 3) and §504 (Count 4)</u>**

Discrimination claims brought under Title II of the ADA are evaluated using the same legal standards as discrimination claims brought under §504 of the Rehabilitation Act. *Christmas v. Nabors*, 76 F.4th 1320, 1333 (11th Cir. 2023). Moreover, ADA and Rehabilitation Act claims based on educational services are subject to the same standards that apply in other disability discrimination contexts. *A.T. ex rel A.J.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 345 (2025). Namely, schoolchildren with disabilities and their parents do not have to satisfy the more stringent standard of proof of "bad faith" or "gross misjudgment" to establish discrimination under Title II of the ADA and §504 of the Rehabilitation Act. *Id.* at 344-45. To raise a viable discrimination claim under both the ADA and §504, a plaintiff must show: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability. *Lewis v. Sheriff, Fulton Cnty. Georgia*, 166 F.4th 107 at 114 (11th Cir.

2026). Further, if the plaintiff seeks monetary damages for his disability discrimination claim, he must also prove that the defendant engaged in intentional discrimination. *Id.* To prove intentional discrimination, the plaintiff must establish that the defendant acted with "deliberate indifference," meaning, the defendant is an official who, at minimum, has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf, had actual knowledge of the discrimination in the entity's programs, and failed to adequately respond. *Id.*

Here, Plaintiffs argue the HCSB engaged in discrimination by forcing John to sign documents without his mother's consent; allowing John to be recorded without consent; and allowing John to be suspended without a proper hearing[7]. Doc.123 ¶¶ 100, 107; Doc. 142 at 13-17. Defendant HCSB argues the discrimination claims fail as a matter of law because, based on the undisputed evidence, Plaintiffs cannot show discrimination or deliberate indifference. Doc. 136 at 13.

HCSB does not dispute that John is a qualified individual with a disability. Therefore, this Court will analyze the latter two prongs of a disability discrimination claim, that is: whether John was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity, and whether the exclusion, denial of benefit,

---

[7] It appears Plaintiffs are attempting to overcome HCSB's Motion for Summary Judgment by arguing a "convincing mosaic" of incidents of discrimination. However, even taking all of Plaintiff's allegations into account as one convincing mosaic, Plaintiff's claims still fail to present a convincing mosaic of discrimination. *See Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1197-99 (11th Cir. 2024).

or discrimination was by reason of the plaintiff's disability. The Court will address each alleged act of discrimination in turn.

**1) Discrimination based on signed referrals without parental notification**

Plaintiffs argue HCSB engaged in discrimination by forcing John to sign referrals without his mother's consent. Doc. 123 ¶¶ 100, 107. They contend that unlike other nondisabled students, John's disability rendered him unable to understand what he was signing and, in turn, rendered him unable to challenge the accuracy of the referrals. Doc. 142 at 13. In their response to Defendant's Motion for Summary Judgment, Plaintiffs also argue that forcing John to sign the referrals demonstrates HCSB's failure to accommodate John. Doc. 142 at 13-14. However, Plaintiffs did not assert a failure to accommodate claim in the Fourth Amended Complaint. Therefore, this Court will analyze the signed referrals based only on the argument that the conduct was discriminatory because John did not understand what he was signing. *See Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1337-38 (11th Cir. 2024) (Plaintiffs may not raise new claims through argument in a brief opposing summary judgment.).

Defendants contend the signed referrals do not show discrimination because there is no requirement that either the child or the parent sign the referral paperwork. They further argue that John's signature is not the result of any deliberate indifference on the part of the HCSB; John was capable of signing his name; and there is no evidence that John's signature excluded John from any program or denied him benefits solely by reason of his disability. Doc. 136 at 13.

A school board does not engage in intentional discrimination where there is no evidence that the school board applied its policies or rules unevenly with respect to disabled students. *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla.,* 610 F.3d 588, 604 (11th Cir. 2010).

Plaintiffs contend that referrals were "routinely processed" without parental notification and often only carried the student's signature. Doc. 142 at 13. However, Plaintiffs fail to provide record evidence to substantiate their claim[8]. Also, based on AP MacGregor's alleged assertions that "there are instances where a teacher doesn't take action on a referral" and "there's no requirement for a parent to sign," Plaintiffs conclude that HCSB staff could rely solely on a child's signature to validate a disciplinary report, even when the child did not comprehend it. Doc. 142 at 13. Plaintiffs then assert that not informing A.W. of the referrals deprived John and A.W. of the opportunity to challenge the referrals, which, in turn, denied them the opportunity to request a manifestation determination review to assess whether John's behavior was merely a manifestation of his disability, as required by law. Doc. 142 at

---

[8] Plaintiffs cite to Doc. 142-6 at 42:4-19, but the deposition excerpt to which Plaintiffs cite does not support the alleged claims. This Court is not obligated to mine the entire deposition to find the correct excerpt. Doc. 51 at 7 ("Both the movant and the party opposing summary judgment shall provide pinpoint citations to the pages and lines of the record supporting each material fact.") Doc. 51, Case Management and Scheduling Order, at 7; *See also Chavez,* 647 F.3d at 1061 ("Making district courts dig through volumes of documents and transcripts would shift the burden of sifting from [the parties] to the courts. With a typically heavy caseload and always limited resources, a district court cannot be expected to do [a litigant's] work for him"); *A.L. v. Jackson Cnty. Sch. Bd.,* 635 F. App'x 774, 786-87 (11th Cir. 2015) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record")).

14. However, Plaintiff failed to proffer any evidence that HCSB staff did not inform A.W. of John's referrals[9]. Plaintiffs then contend that unlike his nondisabled peers, John's disability prevented him from comprehending or communicating about the paperwork. Doc. 142 at 14; Doc. 142-4 at 238:6-11. Nevertheless, even if such claims about the referral process were supported by evidence, Plaintiffs still have not shown how requiring John to sign referrals without informing A.W. resulted in John being excluded from participation in, or denied any benefits of, HCSB's services, programs, or activities, or resulted in John being otherwise discriminated against by reason of his disability. On the contrary, "routinely processing" referrals without requiring parental acknowledgment was, by Plaintiffs' own argument (*See* Doc. 142 at 13), a practice that was equally applied to all students – disabled and nondisabled alike. Because there is no record evidence that the referral process for John differed from the process for nondisabled students in a way that discriminated against John because of his disability, no reasonable jury could find that HCSB discriminated against John by requiring him to sign disciplinary referrals without parental acknowledgment. *See T.W. ex rel.,* 610 F.3d at 604 (finding there was no intentional discrimination where there is no evidence

[9] Plaintiffs argue that A.W. was never informed that John was forced to sign disciplinary documents, and she didn't know about the referrals (Doc. 142 at 13), but the record evidence to which Plaintiffs cite does not support Plaintiffs' proposition. In fact, the pincite that Plaintiffs provide does not mention the referral issue, at all. *See* Doc. 142-4 at 176:5-177:12. It is the party's obligation to properly cite to the record, including pincite citations. *See supra* note 4.

that the school board applied its policies or rules unevenly with respect to disabled students).

**2) Discrimination based on concealed information**

Next, Plaintiffs veer from the signed referrals argument and instead submit a series of occurrences to argue that HCSB regularly concealed information from A.W. regarding John. Doc. 142 at 14-15. For instance, Plaintiffs assert that after restraint was used against John on August 11, 2022, AP MacGregor completed a use-of-restraint report, but the report did not mention that John hit his head on a desk. Doc. 142 at 14; *see also* Restraint Incident Report, Doc. 142-8. Plaintiffs are correct that the restraint incident report completed by AP MacGregor does not explicitly state that John hit his head on a desk. *See* Doc. 142-8. Instead, the report indicates that John was at risk of immediate physical harm. *Id.* at 2. Moreover, the report completed by AP Reynolds specifies that John's "behavior put himself…[at] serious risk of injury." Doc. 142-9 at 2. Therefore, even though the reports did not explicitly spell out John's injury, they sufficiently describe the potential, immediate consequences of John's behavior. This Court need not tease out every detail of what, precisely was included in the restraint incident reports. Instead, the principal legal inquiry is whether HCSB's conduct resulted in John being discriminated against by reason of his disability. To that end, not specifying in an incident report that John hit his head during a behavioral outburst did not result in John being excluded from participation in, or being denied HCSB services, programs, or activities, or that he was otherwise discriminated against because of his disability.

Plaintiffs also claim the restraint incident report was not provided to A.W., which was a direct violation of HCSB policy. Doc. 142 at 14. Although Plaintiffs failed to proffer evidence substantiating that the mandated incident report was not provided to A.W, there is record evidence that pursuant to the school's policy and Florida Statute §1003.573, after restraint is used on a disabled student, an incident report must be provided to the student's parent within 3 school days. Doc. 142-9 at 1. Even if the Court accepts as true that HCSB violated policy by not providing A.W. with an incident report, there is no record evidence to demonstrate that not providing A.W. with the report resulted in John being excluded from participation in, or denied the benefits of, HCSB services, programs, or activities, or that John was otherwise discriminated against by reason of his disability. Instead, by alleging that AP MacGregor did not provide A.W. with the incident report, Plaintiffs merely contend that AP MacGregor did not follow established protocol. Such conduct is violative of policy, but that does not make the conduct discriminatory. Moreover, the proffered restraint policy is specific to disabled students: "Within 24 hours of releasing **a student with a disability** from restraint an incident report must be completed…[and] be sent to the parent or guardian within 3 school days…" Doc. 142-9 at 1 (emphasis added). Since the proffered restraint policy is specific to disabled students, a violation of the policy does not show John was treated differently than a non-disabled student. In other words, the Court cannot analyze whether a policy that is specifically applied to disabled students is discriminatory because, by virtue of the policy being solely

applicable to disabled students, there is no way to discern whether HCSB applied the policy unevenly to nondisabled students.

Next, Plaintiffs allege that HCSB staff recorded John's behavioral outbursts and concealed the recordings from A.W. for two years[10]. Doc. 142 at 15; Doc. 142-5 at 119:18-120:12; Doc. 142-4 at 231:19-25. Plaintiffs then argue that concealing the recordings is evidence of deliberate indifference and systemic discrimination. Doc. 142 at 15. However, this argument is unpersuasive for two reasons. First, Plaintiffs' contention rests on the assumption that HCSB staff affirmatively and intentionally hid the video recordings from A.W., yet the evidence to which Plaintiffs cite does not support such a claim[11]. On the contrary, Ms. Sarran testified she did not know that her assistant was filming John's behavior until the parties attended mediation approximately two years later. Doc. 142-5 at 119:18-120:12. Therefore, Plaintiffs' assertion that Defendants concealed the recordings is a mischaracterization of the evidence. Second, Plaintiffs failed to show that concealment of the video recordings caused John to be excluded from participation in, or denied the benefits of, HCSB's services, programs, or activities, or that hiding the recordings caused John to be otherwise discriminated against because of his disability.

---

[11] The evidence to which Plaintiffs cite to support this claim appears at Doc. 142-5 at 119:18-120:12, and not at the pincites provided by Plaintiffs. It is the party's obligation to properly cite to the record, including pincite citations. *See supra* note 4.

**3) Discrimination based on video recordings without consent**

Plaintiffs also claim HCSB engaged in discrimination by recording John without consent. Doc. 123 ¶¶ 100,107. HCSB responds that there was no discrimination based on the video recordings because A.W. consented to the publication of photographs and videos of John; the videos were not published to the public; and the videos were taken for a permissible purpose. Doc. 136 at 13-14.

A.W. believed her consent was limited to school events such as class photos or performances, and did not encapsulate recordings of John's behavioral outbursts. Doc. 142 at 15; Doc. 142-4 at 231:21-24; 232:7-9. However, the authorization form in the record clearly shows that by way of her signature, A.W. gave permission to HCSB to use and publish photographs and video recordings of John. Doc. 134-13. There is no limitation on the authorization form delineating that the permitted photographs and videos of John could only be used for school events and not to record behavioral episodes.

Plaintiffs then argue that the recordings of John did not serve any educational purpose and were only created to surveil John and collect evidence in anticipation of litigation. *See* Doc. 142 at 15-16; Doc. 142-5 at 119:18-124:5. Plaintiffs' argument fails as a reason to preclude summary judgment because Plaintiffs offer no corroborating evidence. Therefore, Plaintiffs' conclusion that the recordings were merely litigation weapons is a hypothesis, not a triable issue of fact. *See Cordoba v. Dillard's, Inc.,* 419

F.3d 1169, 1181 (11th Cir. 2005) (reasoning that unsupported speculation does not create a genuine issue of material fact to defeat a summary judgment motion).

More importantly, even if HCSB recorded John without consent and only intended to use the footage against Plaintiffs during litigation, there is no record evidence to show that such recordings excluded John from, or denied his participation in, HCSB services or programs by reason of his disability. Plaintiffs attempt to bolster their disparate treatment claim by asserting "teachers would not dare record a nondisabled student in this manner" (Doc. 142 at 16); however, without substantiating evidence demonstrating that HCSB applied the video recording policy to nondisabled students differently than it applied the policy to disabled students, such that disabled students were discriminated against, such an allegation is merely unsupported conjecture that does not defeat summary judgement. Based on the proffered evidence, no reasonable jury could conclude that HCSB discriminated against John by recording and storing videos of his behavioral episodes.

**4) Discrimination based on box cutter suspension**

Plaintiffs contend HCSB discriminated against John by allowing John to be suspended without a proper hearing. Doc. 123 ¶¶ 100, 107. HCSB argues that John's suspensions do not show discrimination because the evidence shows John was suspended because he was in possession of a box cutter and not because he is disabled. Moreover, HCSB highlights that John received the lowest level of reprimand for the

box cutter incident—a 1 day suspension—as evidence that undermines Plaintiffs' disability discrimination claim. Doc. 136 at 14-16.

First, Plaintiffs argue that the factual dispute of whether HCSB planted the box cutter in John's backpack creates a triable issue of fact. Doc. 142 at 16-17. There is a factual dispute among the parties regarding how the box cutter ended up in John's backpack. HCSB offered testimony that Ms. Sarran did not plant the box cutter and she did not see any other HCSB employee plant the box cutter (Doc. 134-11 at 1); Plaintiffs have presented evidence that A.W. checked John's backpack that morning and there was no boxcutter (Doc. 142-4 at 147:16-22). However, A.W. also testified that her allegations that Ms. Sarran or AP MacGregor planted the box cutter were her assumptions and she has no personal knowledge of from where the box cutter came. Doc. 134-9 at 152:9-20. Therefore, although Plaintiffs contend that HCSB planted the box cutter, there is simply no evidence to corroborate Plaintiffs' contention. The allegation that HCSB staff planted the box cutter is an assumption that does not create a triable issue of fact. *See Cordoba,* 419 F.3d at 1181 (reasoning that unsupported speculation does not create a genuine issue of material fact to defeat a summary judgment motion).

Next, Plaintiffs argue that HCSB's failure to conduct a manifestation determination review constitutes discrimination. Doc. 142 at 17. In support of its contention, Plaintiffs cite to the Individuals with Disabilities Education Act ("IDEA"), 34 CFR 300.530(e)(1). However, the Court has already dismissed all counts by which

Plaintiffs sought equitable relief under the IDEA. *See* Doc. 122. For this reason, alone, Plaintiffs' argument regarding IDEA procedural violations is inapposite. Further, Plaintiffs did not raise any IDEA claims in the operative complaint. Doc. 123. Therefore, Plaintiffs IDEA-based arguments are not appropriate. *See Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1337-38 (11th Cir. 2024) (Plaintiffs may not raise new claims through argument in a brief opposing summary judgment.).

Moreover, even if the Court were to consider Plaintiffs' IDEA-based claims, Plaintiffs' contention is not viable because "not every procedural defect results in a violation of the IDEA." *See G.J. v. Muscogee Cnty. Sch. Dist.*, 668 F.3d 1258, 1270 (11th Cir. 2012) (finding no disability discrimination where the school board's failure to conduct a due process hearing did not substantively impact the disabled student's education). In evaluating whether a procedural defect has deprived a disabled student of a free and appropriate education, "the Court must consider the impact of the procedural defect, and not merely the defect *per se*." *Weiss by Weiss v. Sch. Bd. of Hillsborough Cnty.*, 141 F.3d 990, 994 (11th Cir. 1998). Here, even if this Court were to conclude that HCSB violated the IDEA by not conducting a manifestation hearing, there is no evidence to show that a failure to conduct the hearing substantively hampered John's education. In fact, John missed only one day of school, as a result of the box cutter incident. Doc. S-135-3.

Finally, Plaintiffs' contention that HCSB discriminated against John by failing to conduct a manifestation determination review is unpersuasive because, as set forth

in a latter section of this Order[12], HCSB was not required to conduct a manifestation determination review based on the facts at hand.

Ultimately, Plaintiffs have proffered no evidence to show that the way HCSB handled the box cutter incident excluded John from participation in, or denied him the benefits of, HCSB's services or programs based on his disability. Specifically, Plaintiffs do not point to any record evidence demonstrating that HCSB would have handled the situation more favorably for a nondisabled student if a nondisabled student were in possession of a box cutter. *See T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla.,* 610 F.3d 588, 604 (11th Cir. 2010) (finding there was no intentional discrimination where there is no evidence that the school board applied its policies or rules unevenly with respect to disabled students). Therefore, no reasonable jury could find that HCSB discriminated against John by reason of his disability based on John's 1-day suspension for the box cutter incident.

**5) Plaintiffs failed to show deliberate indifference for any of the alleged discriminatory conduct.**

If a plaintiff seeks monetary damages in a disability discrimination case, then after he successfully proves discrimination, he must overcome the evidentiary hurdle of proving the discrimination was intentional. *See Lewis*, 166 F.4th at 114. To prove intentional discrimination, the plaintiff must establish that the defendant acted with "deliberate indifference," meaning, the defendant is an official who, at minimum, has

[12] *See* Section D, infra, "Failure to Hold an IEP Hearing or Manifestation Hearing."

authority to address the alleged discrimination and to institute corrective measures on the entity's behalf, had actual knowledge of the discrimination in the entity's programs, and failed to adequately respond.

Since the Court has concluded that no reasonable jury could find that HCSB discriminated against Plaintiffs by reason of John's disability based on any of Plaintiffs' alleged occurrences of discrimination, the Court need not conduct a deliberate indifference analysis to ascertain whether the alleged discrimination was sufficiently intentional. However, even if Plaintiffs had offered sufficient evidence to show HCSB discriminated against John, Plaintiffs did not show that HCSB acted with deliberate indifference. Plaintiffs' repeated allegations that HCSB acted with "deliberate indifference" are only conclusory statements (*See* Doc. 142 at 15, 16), as Plaintiffs have not pointed to any facts to demonstrate that for each alleged discriminatory act, a HCSB official had the authority and knowledge to remedy the discrimination, yet failed to do so. *See Lewis,* 166 F.4th at 114. Because Plaintiffs seek monetary damages and failed to show deliberate indifference on the part of HCSB, no reasonable jury could find that HCSB discriminated against John because of John's disability.

**B. <u>Retaliation Claims under §504 (Count 9) and the ADA (Count 10)</u>**

The Eleventh Circuit assesses retaliation claims brought under §504 using the same framework used to assess Title VII retaliation claims. *Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec.,* 410 F. App'x 243, 245 (11th Cir. 2011). Further, retaliation

claims under §504 and the ADA are evaluated by the same standard. *See id.* Accordingly, to prevail on a retaliation claim under the ADA or §504, a plaintiff must show: (1) he engaged in a statutorily protected expression; (2) he suffered an adverse action; and (3) there was a causal link between the two events. *Id.*; *Frazier-White v. Gee,* 818 F.3d 1249, 1258 (11th Cir. 2016); *Shotz,* 344 F.3d at 1181 (11th Cir. 2003) (explaining that outside the context of employment-related discrimination claims, a plaintiff only need to show that some type of action occurred that sufficiently qualifies as adverse under the circumstances of the case). The third element requires a showing of but-for causation. *Frazier-White,* 818 F.3d at 1258; *see also Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1192 (11th Cir. 2024) (explaining that the Eleventh Circuit has consistently understood the ADA as imposing a but-for causation standard).

When there is no direct evidence of retaliation, the Eleventh Circuit evaluates the proffered circumstantial evidence using the burden-shifting *McDonnell Douglas* framework commonly applied in Title VII claims. *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021). Under this framework, the plaintiff must first establish a prima facie case of retaliation. *Id.* Once the plaintiff establishes a prima facie case of retaliation, the burden then shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the defendant successfully carries that burden, then the onus is on the plaintiff to show that the defendant's proffered nondiscriminatory reason was merely a pretext to mask retaliation. *Id.*

Plaintiffs allege HCSB retaliated against John by writing referrals against John, filing multiple police reports against John, planting a box cutter in John's backpack, and initiating a DCF investigation. Doc. 123 ¶¶ 141, 151; Doc. 142 at ¶¶ 47-51 and 18-21; *see also* Doc. 142-10. Regarding the referrals, HCSB offers a legitimate, nondiscriminatory reason explaining why the referrals were written. Also, HCSB responds that based on the evidence, none of the allegations support a retaliation claim. Doc. 136 at 16. Regarding the police reports and box cutter incident, HCSB argues summary judgment is warranted because the record evidence shows HCSB is not responsible for either writing the police reports or planting the box cutter. Doc. 136 at 17-18. The Court will address each claim of retaliation in turn.

**1) Referrals as retaliation**

Plaintiffs allege: (1) A.W. engaged in a statutorily protected activity when she complained of abuse on August 11, 2022[13]; (2) the adverse action against John was a series of referrals; and (3) the repeated referrals following A.W.'s complaints of abuse create a triable inference of retaliation. Doc. 142 at 18; *see also* Doc. 142-4 at 62:23-63:15 (referencing A.W.'s complaints of John's physical abuse by Ms. Sarran to an

[13] Although the record evidence to which Plaintiffs direct the Court substantiates that A.W. complained of abuse, it does not indicate the precise date of the complaint. *See* Doc. 142-4 at 62:23-63:15. Further, HCSB does not contest the date of A.W.'s complaints of abuse. Therefore, viewing the evidence in the light most favorable to Plaintiffs, the Court accepts that A.W. engaged in statutorily protected activity before the referrals were issued against John. *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion.")

SRO). Defendants submit that the legitimate, non-discriminatory reason the referrals were issued was to document that a behavioral incident occurred. Doc. 136 at 17. The Court agrees that a review of the referrals and AP MacGregor's testimony shows that the referrals were written to document John's behavioral outbursts. *See* Doc. 123-4; Doc. S-135-2 at 2, 4-6; Doc. 142-6 at 25:9-19. Plaintiffs do not offer any argument or evidence demonstrating that HCSB's stated nondiscriminatory reason for issuing the referrals—i.e., documentation of John's behavior—was merely a pretext to mask true discriminatory animus. Therefore, there are no facts to support that a reasonable jury could conclude that the multiple referrals were written in retaliation of Plaintiffs' protected activity.

**2) Police reports as retaliation**

HCSB argues the SRO, who is employed by the "Sheriff's Office", is responsible for writing the incident reports. Doc. 136 at 18; Doc. 134-3 at 26:3-17; Doc. 134-6 at 36:25-37:1; Doc. 134-6 at 38:23-39:4 and 44:5-10. Therefore, since no HCSB employee directed the SRO to write the reports, summary judgement is warranted. Doc. 136 at 18. Plaintiffs do not contest that the Sheriff's Office—and not HCSB—was responsible for the police reports. *See* Doc. 142 at 18. Instead, Plaintiffs posit that because HCSB allows SROs on campus, HCSB had a responsibility to communicate law enforcement's interaction with John to A.W. Doc. 142 at 18-19. Plaintiffs allege HCSB's concealing of the incident reports is part of an overarching pattern of retaliatory discrimination. Doc. 142 at 19.

A prima facie case of discriminatory retaliation requires a showing of some conduct by the defendant. *See Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). ("In order to satisfy the 'causal link' prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression **at the time the defendant took the adverse… action**.") (emphasis added); *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1151 (11th Cir. 2005) ("The plaintiff bears the burden of proving that the **[defendant] took an adverse action against him** on the basis of a protected personal characteristic.") (emphasis added) (citation modified). Moreover, if a plaintiff can prove that a defendant directed an agent to take an adverse action; the agent was aware of the plaintiff's protected activity; and the agent acted within the scope of his agency when he took the action, then the plaintiff has established that the defendant will be held liable for the adverse action taken by the agent. *See Raney,* 120 F.3d at 1197; *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1162 (11th Cir. 1993).

Here, it is not enough for Plaintiffs to show that John was the subject of SRO incident reports. There must be evidence that **HCSB** took, or directed an agent to take, adverse action against John. Plaintiffs have not directed the Court to any record evidence that HCSB wrote, or directed an SRO to write, the incident reports. To the contrary, Plaintiffs concede that HCSB did not "directly direct" the SRO reports. Doc. 142 at 18. Further, the record evidence shows: no HCSB employee filed a police report against John to the Sheriff's Office (Doc. 134-7 at 8); SROs prepare the incident reports

(Doc. 134-6 at 38:23-39:4; 44:5-10); SROs are employed by the Sheriff's Office (Doc. 134-3 at 26:3-17; Doc. 134-6 at 36:25-37:1); and the Sheriff's Office dictates the policies and procedures for the reports (Doc. 134-6 at 38:25-39:4; 44:5-10). Since Plaintiffs have not proffered any evidence to show that the HCSB authored, or directed the creation of, the SRO reports against John, Plaintiffs have not proven the second prong of a prima facie case of retaliation, that is, that John suffered an adverse action at the hands of HCSB. Hence, no reasonable jury could find that the incident reports were a retaliatory act by HCSB against John.

**3) Planting a box cutter as retaliation**

HCSB argues summary judgment is warranted because there is no evidence to support Plaintiffs' assumptions that Ms. Sarran or AP MacGregor planted the box cutter in John's bag. Doc. 136 at 18. Plaintiffs respond that the box cutter incident is the culmination of a retaliatory scheme carried out by HCSB against Plaintiffs. Doc. 142 at 19-20.

The record is clear that a box cutter was found in John's bag. Doc. 134-1 at 167:3-168:5. Plaintiffs provide testimony from A.W. that no box cutter was in the backpack when she packed it that morning as circumstantial evidence that the box cutter was planted. Doc. 142 at 20; Doc. 142-4 at 147:16-22. Plaintiffs also argue that AP MacGregor's testimony that John was not present in the classroom when the backpack was searched is also circumstantial evidence that HCSB planted the box cutter. Doc. 142 at 20; Doc. 142-6 at 57:21-58:15. However, Plaintiffs have not

directed the Court to any testimony, affidavits, or any other record evidence to substantiate their claims that it was an HCSB employee who placed the box cutter in John's bag. Without such record evidence, Plaintiffs' conclusion about how the box cutter ended up in John's backpack is merely an unsupported hypothesis that does not create a genuine issue of material fact. *See Cordoba,* 419 F.3d at 1181 (reasoning that unsupported speculation does not create a genuine issue of material fact to defeat a summary judgment motion). This is especially so where there is record evidence that AP MacGregor and Ms. Sarran unequivocally deny planting the box cutter and did not witness a HCSB employee put the box cutter in John's backpack. Doc. 134-12 ¶¶ 2,3. Doc. 134-11 ¶¶ 2,3. Also, according to the HCSB Student Code of Conduct, possession of a boxcutter may result in expulsion, a 1-year placement at an alternative school, or 10 days out of school suspension or expulsion. Doc. 134-5 at 10, 42 of 71. In short, Plaintiffs have failed to establish a prima facie case of retaliation based on the box cutter suspension because the alleged adverse action—that a HCSB employee planted the box cutter so it could build a case against John to suspend him—is unsubstantiated speculation with no basis in the record evidence. No reasonable jury could find that HCSB retaliated against John by planting a box cutter in his backpack and suspending him for the same.

**4) DCF reports as retaliation**

Plaintiffs allege HCSB staff retaliated against John by reporting to the Department of Children of Families ("DCF") that A.W. choked John. Doc. 142 at

20-21; Doc. 142 ¶¶ 47-54, at 8; *see also* Doc. 142-10 (containing the DCF investigative summaries). Plaintiffs did not specify the DCF investigation as a retaliatory act within the body of the retaliation counts (i.e., Counts 9 and 10). *See* Doc. 123 ¶¶ 141, 151. Plaintiffs did, however, allege in the general facts section of the operative complaint that HCSB initiated the DCF reports out of retaliation. *See* Doc. 123 ¶ 65. By incorporating paragraph 65 into Counts 9 and 10, Plaintiffs alleged that HCSB contacted DCF out of retaliatory animus[14]. Plaintiffs elaborated on the DCF reporting allegation in their Response to HCSB's Motion for Summary Judgement (*see* Doc. 142), and HCSB presented a brief retort (*see* Doc. 144). However, neither party adequately addressed the DCF reporting issue.[15] Therefore, this Court ordered the parties to provide supplemental briefing specifically on whether HCSB's alleged report to DCF about A.W. and John constituted retaliatory conduct. *See* Doc. 155.

In its supplemental brief, HCSB avers John has not established a prima facie retaliation claim regarding the DCF reporting because John did not suffer an adverse action as a result of the DCF reporting; a retaliatory investigation, alone, is not an adverse action; the record does not establish who initiated the DCF reports; and whoever called DCF had a legitimate, non-retaliatory reason for doing so. Doc. 156

---

[14] Although the Court is allowing Plaintiffs' retaliation claim based on the DCF reporting to move forward, Plaintiffs are reminded that a complaint must be sufficiently clear and organized to put the defendant(s) on notice of the claims against them and the grounds upon which each claim rests. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).

[15] The Court is aware HCSB likely did not address the DCF report allegation in its motion for summary judgement (Doc. 136) because Plaintiffs did not explicitly list the DCF reports as retaliatory acts in Counts 9 and 10 of the operative complaint.

at 1-2. In their supplemental brief, Plaintiffs respond that A.W. engaged in protected activity by repeatedly complaining that the school staff abused John; the DCF report was a materially adverse action; and the record shows a causal connection between A.W.'s protected activity and the DCF reports. Doc. 157.

Because HCSB does not contest whether Plaintiffs engaged in a protected activity, the Court's analysis will examine the latter two prongs of a prima facie retaliation claim: whether Plaintiffs have shown that an adverse action occurred and whether there is a causal connection linking the protected activity and the adverse action.

*DCF Report: Adverse Action*

HCSB maintains there is no record evidence of an adverse action because a DCF investigation is not an adverse action, and there is no evidence that John was aware of, or affected by, the DCF investigation. Doc. 156 at 2-5. Plaintiffs respond that the DCF reports constitute a materially adverse action. Doc. 157 at 2-3.

Outside the context of employment-related discrimination claims, a plaintiff needs to show only that some type of action occurred that sufficiently qualifies as adverse under the circumstances of the case. *Shotz,* 344 F.3d at 1181-83 (11th Cir. 2003) (finding an adverse action had occurred when the defendant municipality issued a press release that contained the plaintiff's "most personal facts"). Not every unkind act is sufficiently adverse. *Id.* at 1181-82. Instead, the conduct must be serious and material enough to be considered adverse. *Id.* at 1182-83. Further, while the adverse

action must be material, it does not need to be traumatic. *Id.* at 1182. Whether conduct constitutes an "adverse action" is analysis that must be determined on a case-by-case basis, using both a subjective and objective standard. *Id.* at 1181. An ADA plaintiff must show that a reasonable person in his position would view the conduct as adverse. *Id*. Specifically, the plaintiff must show that the challenged action would have dissuaded a reasonable person from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

In the instant case, HCSB argues the DCF reports do not rise to the level of an "adverse action" because the reports led only to an investigation. Doc. 156 at 3-4. The Court is not persuaded by this argument. First, the precedential authority to which HCSB cites is misplaced. HCSB employs jurisprudence from outside the realm of disability discrimination to argue a third-party investigation cannot amount to an adverse action. *See* Doc. 156 at 3-4. Reliance on such authority is misguided because those cases do not apply the proper standard—as is necessary in the context of disability discrimination—to determine whether the defendant retaliated against the plaintiff. Specifically, the cases to which HCSB cites concern whether an allegedly retaliatory criminal investigation and/or prosecution implicates a constitutional tort. *See Thompson v. Hall,* 426 F. App'x 855, 858 (11th Cir. 2011); *Shiver v. City of Homestead, Fla.,* 2021 WL 5174526, at *8 (S.D. Fla. Oct. 4, 2021); *Hartman v. Moore*, 547 U.S. 250, 262 n. 9 (2006). However, in the context of disability discrimination and retaliation

claims, the Court must conduct a very discrete inquiry when analyzing retaliation. Here, the Court must determine whether the alleged retaliation would dissuade a reasonable person from pursuing a discrimination claim. *See Burlington,* 548 U.S. at 68 (quoting *Rochon*, 438 F.3d at 1219). Plaintiffs have not met the subjective standard in showing the conduct to be adverse because they have offered no evidence to show that John subjectively believed HCSB retaliated against him[16]. Objectively, being the subject of a DCF report and investigation can result in negative consequences such as involvement in dependency legal proceedings and child removal. Therefore, viewing the evidence in a light favorable to Plaintiffs, a DCF investigation is objectively adverse because the threat of parent-child separation is a valid risk that is serious enough to deter an individual from coming forward with a discrimination claim.

In support of its position that the DCF reports did not constitute an "adverse action" against John, HCSB also argues Plaintiffs failed to show any "adverse action" because the retaliation counts were brought by John, but A.W. is the target of the alleged retaliation. Doc. 156 at 5. The Court agrees that Plaintiffs have not directed the Court to any record evidence to show that John was, independently from A.W., the target of retaliatory conduct. However, the DCF investigation concerns both A.W. and John, as the purpose of a DCF investigation is to ensure the safety of the child. Therefore, a DCF investigation is opened only when a child is involved. Moreover,

[16] A.W. testified she believes Mr. MacGregor retaliated against her by calling DCF. Doc. 134-9 at 159:15-19. However, the retaliation counts (i.e., Counts 9 and 10) name John, not A.W., as the victim of retaliation. *See* Doc. 123.

the DCF report names both A.W. and John. *See* Doc. 142-10. It intuitively follows that a DCF report and investigation that names both the child and child's mother would be considered an action taken against both the child and the mother. *See Burlington*, 548 U.S. at 70-71 (suggesting that courts are permitted to use common sense to determine whether a defendant's conduct was a retaliatory adverse action).

*DCF Report: Causal Connection*

HCSB argues there is no evidence that it initiated the investigation. Doc. 156 at 5-6. Plaintiffs respond there are material issues of fact such that a reasonable jury could find that HCSB initiated the DCF investigation out of a retaliatory animus. Doc. 157 at 3-5. Namely, AP MacGregor's deposition testimony, the contents of the DCF report, and the timing of the DCF report create triable issues as to who initiated the DCF investigation. Doc. 157 at 4-5.

To establish a causal connection, a plaintiff must only show that the protected activity and the adverse action were not wholly unrelated. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (quoting *Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346,1354 (11th Cir. 1990); *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1278 (11th Cir. 2008). Moreover, the causal connection element of a retaliation claim requires the plaintiff to show that engaging in the protected activity was the but-for cause of the adverse action. *Frazier-White*, 818 F.3d at 1258; *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (explaining that a plaintiff must prove

that had she not engaged in the protected conduct, the adverse action would not have occurred).

The Court agrees with Plaintiffs that there is record evidence whereby a reasonable jury could conclude that a staff member from John's school initiated the call to DCF. Specifically, AP MacGregor testified that someone from his school—maybe even himself—called DCF to comply with established protocol. Doc. 142-6 at 76:1-77:13. Therefore, given the facts that A.W. complained about John's school to the school district, and a school employee initiated the DCF call, a reasonable jury could infer that A.W.'s complaints to the school district and the DCF investigation were related. However, the analysis cannot stop there. Aside from showing that the protected activity and alleged retaliation are not wholly unrelated, a plaintiff must also prove that but for Plaintiff's protected conduct, the adverse action would not have occurred. *Farley,* 197 F.3d at 1337 (quoting *Clover*, 176 F.3d at 1354); *Frazier-White,* 818 F.3d at 1258; *Gogel*, 967 F.3d at 1135. Here, Plaintiffs have not directed the Court to any record evidence to show that if A.W. had not complained, then the DCF investigation would not have occurred. On the contrary, the record evidence suggests that HCSB would have initiated the DCF investigation even if A.W. had not engaged in protected conduct, as it was standard procedure for school staff to call DCF whenever a student possessed a box cutter. Doc. 142-6 at 76:1-11. Hence, Plaintiffs have not established that A.W.'s complaint(s) was the but-for cause of the DCF report and investigation.

Additionally, close temporal proximity between the protected conduct and the alleged retaliation can establish causation. *Brathwaite v. Sch. Bd. of Broward Cnty.*, 763 F. App'x 856, 860–61 (11th Cir. 2019) (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363-64 (11th Cir. 2007). The Eleventh Circuit has not announced a bright-line rule that establishes the requisite temporal proximity between the protected conduct and the adverse action to infer a causal connection. *Id.* at 861 (citing *Thomas*, 506 F.3d at 1364). Although a three-to-four month timespan between the protected conduct and adverse action may be too great to establish a causal connection, "days"—up to two weeks—may be sufficient. *Thomas,* 506 F.3d at 1364 (A three-to-four-month disparity between the protected activity and the adverse action is not enough.); *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 926 (11th Cir. 2018) (An adverse action within days, up to two weeks, can be circumstantial evidence of a causal connection.).

Here, Plaintiffs argue, "the timing of the report closely followed A.W.'s complaints regarding the suspension and box cutter incident," but Plaintiffs failed to direct the Court to any record evidence to substantiate their claim. Doc. 157 at 5. Namely, Plaintiffs did not direct the Court to any evidence to show the date of A.W.'s complaint(s) compared against the date that the DCF investigation was initiated[17]. The Court's independent review of the record shows that A.W. complained to the school district about the alleged mistreatment John was enduring at Explorer K-8 on August 23, 2022 and August 24, 2022. Doc. S-135-5 at 25-27. By way of comparison, the DCF

[17] *See supra* note 4.

investigation began on September 14, 2022. Doc. 142-10 at 1. Hence, 22 days passed between A.W.'s complaint to the school district and the DCF investigation. The Court finds that the 22 days is circumstantial evidence of a causal connection between A.W.'s complaint that John was being mistreated and the school district's decision to initiate a DCF investigation.

In conclusion, Plaintiffs have successfully presented a prima facie case showing that HCSB retaliated against John because (1) there is no dispute that A.W. engaged in protected activity, (2) initiating a DCF report about a mother and her child constitutes an "adverse action," and (3) a time span of 22 days between A.W.'s complaints and the DCF investigation establishes a causal connection. The Court now turns its analysis to whether there was a legitimate, non-retaliatory basis for HCSB to initiate a DCF investigation against A.W. and John.

*DCF Report: Legitimate, Non-Retaliatory Basis*

HCSB contends that even if Plaintiffs had successfully established a prima facie showing that the HCSB executed a DCF investigation against A.W. out of retaliatory animus, there was a legitimate, non-retaliatory reason for HCSB to initiate the DCF investigation. Doc. 156 at 6-7. HCSB further argues that the reporting party is statutorily immune from liability, pursuant to Florida Statute §39.203[18]. Doc. 156 at

[18] HCSB cites to Fla. Stat. 36.203, but the Court understands this to be a scrivener's error.

6-7. Plaintiffs respond that HCSB is not protected by statutory immunity because HCSB initiated the report out of retaliatory animus. Doc. 157 at 7.

The record evidence supports that HCSB had a legitimate, non-retaliatory reason for calling DCF. Specifically, AP MacGregor testified that it was standard procedure for a school staff member to initiate a DCF report when a student brings a box cutter to school. Doc. 142-6 at 76:1-77:13.

The Court need not engage the parties' quarrel over whether Florida Statute §39.203 protects HCSB from liability for initiating the DCF investigation, as Plaintiffs have failed to first show, as a threshold matter, that HCSB's proffered legitimate, non-retaliatory rationale for calling DCF was only pretextual, as required by *McDonnel-Douglas*. Because Plaintiffs did not rebut HCSB's legitimate, non-discriminatory reason, no reasonable jury could find that HCSB initiated a DCF investigation about John in retaliation for A.W. complaining about discrimination against John.

### C. <u>Failure to Prevent Discrimination under §504 (Count 11) and the ADA (Count 12)</u>

Both parties submit that the precedential authority most analogous to Plaintiffs' claim of "failure to prevent disability discrimination" is a failure to prevent harassment under Title IX. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) (teacher-on-student harassment); *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526

U.S. 629 (1999) (student-on-student harassment)[19]. Under *Gebser* and *Davis*, if a plaintiff successfully shows that the school district was deliberately indifferent to known acts of harassment, then the school district may be liable for damages under Title IX. Moreover, the Eleventh Circuit has held that it is appropriate to look to Title IX case law for guidance in examining discriminatory intent under § 504. *J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.,* 877 F.3d 979, 987 (11th Cir. 2017). Under Title IX (and, by extension, § 504), a plaintiff may establish intentional discrimination by showing deliberate indifference. *Id.*

Here, HCSB argues Plaintiffs cannot demonstrate HCSB acted with deliberate indifference (Doc. 136 at 20, Doc. 144 at 9). Plaintiffs contend HCSB acted with deliberate indifference when it failed to take corrective action after A.W. repeatedly reported multiple incidents of physical abuse, neglect, and retaliation HCSB employees inflicted upon John. Doc. 142 at 22-23. Labeling Counts 11 and 12 as "disability discrimination – failure to prevent" implies HCSB should have taken some concrete action to prevent Plaintiffs from being discriminated against. However, §504 does not require an entity to take any affirmative action on behalf of people with disabilities. *Rylee v. Chapman*, 316 F. App'x 901, 906-07 (11th Cir. 2009). It only requires the absence of discrimination against people with disabilities. *Id.* Regarding the viability of a "failure to prevent discrimination" claim under the ADA, there are

---

[19] Whereas HCSB explicitly states that *Gebser* is the most analogous precedential case; Plaintiffs cite to both *Gebser* and *Davis*, with no apparent preference for either authority.

only three theories under which a claim may proceed under the ADA: intentional discrimination, disparate treatment, or failure to make reasonable accommodations. *Rylee v. Chapman*, 316 F. App'x 901, 906 (11th Cir. 2009). Therefore, based on the foregoing, as well as the Court's previous Order regarding HCSB's Motion to Dismiss the Third Amended Complaint (Doc. 122)[20], the Court will construe Counts 11 and 12 as allegations of intentional discrimination under §504 and the ADA.

Discrimination claims brought under Title II of the ADA are evaluated using the same legal standards as discrimination claims brought under §504 of the Rehabilitation Act. *Christmas v. Nabors*, 76 F.4th 1320, 1333 (11th Cir. 2023). Moreover, ADA and Rehabilitation Act claims based on educational services are subject to the same standards that apply in other disability discrimination contexts. *A. J. T. by & through A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 345 (2025). To raise a viable discrimination claim under either Title II or § 504, a plaintiff must show: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability. *Lewis v. Sheriff, Fulton Cnty. Georgia*, 166 F.4th 107, 114 (11th Cir. 2026). Further, if the

[20] In the Order Granting in Part and Denying In Part HCSB's Motion to Dismiss the Third Amended Complaint (Doc. 122), the Court reasoned that Plaintiffs' allegations labeled "failure to prevent discrimination," stated a claim, instead, for intentional disability discrimination that warrants compensatory damages. *See* Doc. 122 at 38.

plaintiff seeks monetary damages for his disability discrimination claim, he must also prove that the defendant engaged in intentional discrimination. *Id.* To prove intentional discrimination, the plaintiff must establish that the defendant acted with "deliberate indifference," meaning, the defendant is an official who, at minimum, has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf, had actual knowledge of the discrimination in the entity's programs, and failed to adequately respond. *Id.* (quoting *Ingram v. Kubik*, 30 F.4th 1241, 1257 (11th Cir. 2022).

Here, HCSB maintains that even when construed as intentional discrimination claims, Counts 11 and 12 yet fail as a matter of law because HCSB did not display any deliberate indifference based on the record evidence. Doc. 136 at 20, Doc. 144 at 9. Plaintiffs contend Counts 11 and 12 should proceed due to HCSB's failure to investigate or implement any correct action to stop the mistreatment of John. Doc. 142 at 22-23.

Deliberate indifference is an exacting standard. *Silberman v. Miami Dade Transit,* 927 F.3d 1123, 1134 (11th Cir. 2019). To prove the defendant acted with "deliberate indifference," a plaintiff must show the defendant is an official who, at minimum, has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf, had actual knowledge of the discrimination in the entity's programs, and failed to adequately respond. *Lewis,* 166 F.4th 107, 114 (11th Cir. 2026); *See also Liese v. Indian River Cnty. Hosp. Dist.,* 701 F.3d 334, 351 (11th Cir. 2012).

*Authority To Address the Alleged Discrimination and Institute Corrective Measures*

Here, Plaintiffs identify Ms. Sarran and AP Macgregor as the HCSB employees who engaged in "a long history of retaliation and neglect". Doc. 142 at 22. However, there is no record evidence to show that Sarran was anything more than a line-employee of HCSB, with no decision-making authority. Therefore, Ms. Sarran is not an official for the sake of meeting the deliberate indifference standard. *See Silberman*, 927 F.3d at 1135 (finding that bus drivers were not qualifying officials because "they aren't high enough up the org chart to permit a reasonable inference that, through their actions, they speak for [the organization]").

In a prior order, the Court found that AP MacGregor likely qualified as an official for the purpose of deliberate indifference. Doc. 72 at 19-20; *J.S.,* 877 F.3d at 988 (reasoning that a principal is the highest-ranking official at a school, and therefore, has ample authority to address the alleged discrimination and take corrective measures). Moreover, this Court's independent review of the record shows that AP MacGregor testified that part of his job responsibilities as an assistant principal is to evaluate teachers, run the organization, and assist the principal with her efforts and vision. Doc. 142-6 at 16:11-17:2. Hence, the Court, again, reasonably infers that because AP MacGregor was an assistant principal, he was able to address the alleged discrimination and institute corrective measures. *See Silberman,* 927 F.3d at 1135 (clarifying that an official doesn't have to be so high up the chain of command that she

is authorized to set an entity's policy, but she must be high enough that her actions constitute an official decision by the entity itself not to remedy the misconduct).

*Actual Knowledge of the Alleged Discrimination*

Plaintiffs allege deliberate indifference based on a theory that there was not a single, isolated incident of discrimination, "but a long history of retaliation and neglect" that HCSB ignored. Doc. 142 at 22. The Court will now address whether AP MacGregor knew of each discriminatory act alleged by Plaintiffs.

First, Plaintiffs allege HCSB ignored A.W.'s multiple reports of abuse. Doc. 142 at 22. There is record evidence that AP MacGregor knew about the alleged abuse. Namely, the parties agree that AP MacGregor was involved in the August 11th restraint incident. Doc. 146 ¶ 19; *see also* Doc. 142-8, "Involuntary Examinations and Restraint and Seclusion (IERS) RESTRAINT Incident Report." Further, A.W. testified that HSCB employees held John on the ground, were on his back, stepped on his finger, and twisted his ear. Doc. 134-9 at 129:17-131:25. Moreover, the parties agree that A.W. met with AP MacGregor on August 12, 2022 regarding the restraint incident that occurred the day prior. Doc. 146 ¶¶ 19, 20.

Plaintiffs also claim HCSB did not immediately send John to the nurse after he sustained a head injury. Doc. 142 at 22. However, the record evidence to which Plaintiffs cite does not indicate that AP MacGregor was aware that John's headache was not immediately addressed. Instead, the cited-to evidence indicates it is against school protocol for a student to injure his head earlier in the day but not be checked

out by the school nurse until 3:30pm. Doc. 142-6 at 39:1-39:13. Also, John was sent to the school's clinic at 3:30pm, near the end of the day. Doc. 123-3, Exhibit C, at 2; Doc. 142-6 at 38:21-25. Plaintiffs did not cite any record evidence to show when John's head injury occurred or when he first complained of a head injury. Plaintiffs only cite an excerpt from AP MacGregor's deposition where he testified that he does not recall the time of day John's head injury occurred. Doc. 142-6 at 35:4-12.

Next, Plaintiffs allege AP MacGregor and Ms. Sarran did not report John's claim of being struck with a stick to DCF. Doc. 142 at 22. There is record evidence that AP MacGregor and/or Ms. Sarran struck John with a stick. *See e.g.,* Doc. 132-7 at 10:25-12:13; Doc. 134-9[21] at 125:3-12; 132:23-133:2; 137:17-138:24; 154:20-24. Also, viewing the evidence in the light most favorable to A.W., a jury could infer that A.W. conducted a meeting with AP MacGregor and Ms. Sarran to discuss the stick allegation. *See* Doc. 134-9 at 104:4-7. Based on the foregoing, the record supports that AP MacGregor knew that John had been hit with a stick. Instead, the cited-to deposition excerpt only establishes that Ms. Sarran vaguely remembers a conversation where A.W. asked Ms. Sarran if she knew about a man hitting John. *See* Doc. 142-5 at 76:21-77:10.

Plaintiffs also argue AP MacGregor issued multiple disciplinary referrals against John without notifying his mother or providing accommodations. Doc. 142 at 22. However, Plaintiffs have not proffered any record evidence to show that AP

[21] See *supra* note 6.

MacGregor was aware that HCSB employees issued referrals against John without notifying his mother or providing accommodations. Instead, Plaintiffs cite to a portion of A.W.'s deposition that is irrelevant to the referrals issues[22]. The Court is aware that there are referrals in the record with AP MacGregor's signature. *See* Doc. 135-2 at 2, 4-12. Notwithstanding AP MacGregror's knowledge about the referrals, this Court has already determined that no reasonable jury could find that issuing John referrals and requiring him to sign the referrals without a parent present was a discriminatory act. *See supra* at 13-16. Therefore, since issuing the referrals was not a discriminatory act, it is of no consequence that AP MacGregor knew about the referrals.

Next, Plaintiffs contend AP MacGregor physically struck or restrained John on multiple occasions. Doc. 142 at 22. John testified "he was hitting me from the stick or from my back and my head." Doc. 142-3 at 10:22-11:8. John later testified he does not know if it was a man or woman who hit him, and there is record evidence that Ms. Sarran is the individual who hit John with the stick. Doc. 142-3 at 11:4-5; Doc. 142-4 at 115:23-25; 116:20-23. However, viewing the evidence in the light most favorable to the non-moving party[23], the Court concludes that John's initial testimony that "**he** was hitting me from the stick or from my back and my head" is sufficient, considered in

[22] In support of their proposition that Ms. Sarran and AP MacGregor issued multiple disciplinary referrals against John without notifying his mother or providing accommodations, Plaintiffs cite to Doc. 142-4 at 176:5-177:12. *See* Doc. 142 at 22. However, the cited-to excerpt offers no testimony regarding the referrals. Plaintiffs are reminded that it is the parties' responsibility to provide to the Court accurate pincites. *See supra* note 4.

conjunction with other evidence[24], to establish that John was referring to AP MacGregor. Doc. 142-3 at 10:25-11:3 (emphasis added). Hence, there is record evidence that AP MacGregor was aware that John was hit on the head with a stick.

Finally, Plaintiffs allege Sarran and MacGregor retaliated against Plaintiffs by concealing restraint reports, coercing John to sign referrals, generating Sherriff's Office reports without parental notice, and suspending John based on a planted box cutter. Doc. 142 at 23. However, Plaintiffs do not cite any substantiating evidence, and the Court has already concluded that no reasonable jury could find that retaliation was the catalyst driving any of the aforementioned conduct[25]. *See* supra.

Considering the evidence proffered by Plaintiffs, a reasonable jury could find that AP MacGregor was aware of the August 11th restraint incident and that John was hit on the head with a stick. Notwithstanding this finding, at this point the Court does not conclude whether the August 11th restraint incident and John being hit with a stick are acts of intentional discrimination. Instead, based on the parties' contentions regarding the deliberate indifference standard[26], this current analysis is limited to the

---

[24] John also testified that "they" hit him with a stick, and he is not sure if it was a man or woman who hit him with a stick. Doc. 142-3 at 11:4-12. Also, A.W. testified that John stated both Ms. Sarran and Mr. MacGregor hit John with a stick. Doc. 142-4 at 104:5-7.
[25] The Court noted Plaintiffs did not cite to any record evidence that a restraint report was not provided to A.W. *See supra* at 17. The Court also concluded, *supra*, that Plaintiffs have not proffered evidence to show that requiring John to sign a referral is a retaliatory act. *See supra* at 27. Regarding the Sheriff's Office reports, the Court concluded no reasonable jury could find that the SRO reports were a retaliatory act. *See supra* at 29. And, finally, the Court concluded no reasonable jury could find that HCSB suspended John for possessing a box cutter out of retaliation. *See supra* at 31.

[26] In the HCSB's Motion for Summary Judgement (Doc. 136), Plaintiffs' Response (Doc. 142), and HCSB's Reply (Doc. 144), the parties did not directly address whether the conduct alleged in Counts

sole issue of whether the official with the authority to implement corrective action was aware of these two, allegedly discriminatory acts. The Court now moves to the next prong of the deliberate indifference analysis, that is, whether HCSB failed to respond to the allegations of abuse and discrimination.

*Failure to Adequately Respond*

Plaintiffs allege that although A.W. made multiple reports of physical abuse beginning August 11, 2022, John continued to be abused and HCSB did not credibly investigate A.W.'s complaints. Doc. 123 at ¶¶ 159, 163, 167, 171; Doc. 142 at 22. HCSB retorts the evidence reflects that when HCSB received notice of A.W.'s complaints, HCSB did not act with deliberate indifference. Doc. 136 at 21-22; Doc. 144 at 9.

A school administrator will only be deemed deliberately indifferent if their response or lack thereof is clearly unreasonable in light of known circumstances. *J.S.,* 877 F.3d at 988-989 (finding a jury could find deliberate indifference where, after receiving notice of the teacher's alleged maltreatment of student, the principal did not follow-up with the teacher, did not interview the child or his parents, and did nothing after receiving a second notice of the teacher's misconduct); *See also Silberman,* 927 F.3d at 1135 (commenting that there was no discrimination where, in response to

11 and 12 constitutes intentional discrimination. Instead, the parties focused their arguments on whether HCSB's conduct met the "deliberate indifference" standard.

plaintiff's complaints of disability discrimination, a managerial employee conducted an investigation).

Here, A.W. met with AP MacGregor on August 12, 2022 to discuss John's report that school employees hit him with a stick. Doc. 134-9 at 104:5-7. On August 19, 2022, A.W. called HCSB to complain that AP MacGregor and the school staff were not following John's IEP and that AP MacGregor hit John in his head with a stick. Doc. S-135-5 at 20. Moreover, on August 23, 2022, A.W. emailed a HCSB District employee complaining that Explorer K-8 employees pulled John's ear, bent his finger back, stepped on his feet, choked him, and hit him in the head with a stick. Doc. S-135-5 at 30-32.

The Court finds that HCSB responded swiftly and appropriately to A.W.'s complaints. First, in response to A.W.'s August 12th and August 19th complaints, School Staffing Specialist Amanda Bigwood suggested that an IEP meeting take place on August 22, 2022. Doc. 146 ¶ 22; Doc. S-135-5 at 22. Second, Principal Braithwaite conducted a documented internal investigation whereby she interviewed six witnesses, including Ms. Sarran and AP MacGregor. Doc. 134-10 at 18:15-22:15; 26:21-27:19. Although Principal Braithwaite did not interview John, Principal Braithwaite explained the decision not to interview John was based on her consideration of John's disability. Doc. 134-10 at 17:25-18:14. And Principal Braithwaite conducted the investigation under the auspices of the HCSB's Supervisor of Professional Standards and Director of Human Resources. Doc. 134-6 at 54:17-56:15. Ultimately, Principal

Braithwaite concluded A.W.'s allegations were unsubstantiated. Doc. S-135-5 at 1. Plaintiffs' disapproval of the investigation's outcome does not mean the investigation was inadequate or otherwise faulty. To the contrary, Principal Braithwaite followed HCSB protocol in handling allegations of teacher-on-student abuse, and she interviewed not only the alleged perpetrators, but also witnesses. Doc. 134-10 at 18:15-22:15; 26:21-27:19. On the instant record, the Court finds no reasonable jury could find that HCSB acted with deliberate indifference when it responded to A.W.'s allegations of abuse and disability discrimination because Principal Braithwaite conducted an appropriate investigation that aligned with HCSB protocol.

In short, Plaintiffs have merely asserted that HCSB acted with "deliberate indifference" without directing the Court to record evidence to support the claim. Therefore, the Court concludes no jury could find that HCSB intentionally discriminated against John based on alleged abuse, retaliation, or neglect.

**D. Failure to Hold an IEP Hearing or Manifestation Determination Review**

Regarding the IEP hearing, HCSB highlights that after receiving the initial complaint from A.W. against Sarran, ESE Staffing Specialist Amanda Bigwood proposed conducting an IEP meeting. Doc. 136 at 22. In response, Plaintiffs argue that because the IEP hearing occurred after John had already endured three removals and a suspension, the IEP hearing occurred too late to comply with IDEA and §504. Doc. 142 at 23-24.

As to the manifestation hearing, HCSB argues no manifestation hearing was required because John was suspended for only one day, and Plaintiffs do not allege that John underwent a change of placement. Doc. 136 at 22. Plaintiffs maintain that John's removal from class on August 11, August 12, and August 18, along with the one-day suspension related to the box-cutter incident, constitute a cumulative change of placement that triggers the need for a manifestation determination review. Doc. 142 at 23.

The Court will first address Plaintiffs' insistence that HCSB failed to conduct an IEP meeting. Although §504 of the Rehabilitation Act requires schools to develop a §504 plan for students with disabilities, §504 does not specifically mandate an IEP meeting. The IDEA provides the regulatory framework that requires IEP meetings. *See* 20 U.S.C.A. § 1414; 34 C.F.R. § 300.323. Plaintiffs' discrimination claims based on the IDEA have been dismissed. *See* Doc. 137. Nevertheless, the Court will still address Plaintiffs' IEP meeting contention. An initial IEP meeting to develop an IEP for a child must be conducted within 30 days after determining a child needs special education services. 34 C.F.R. § 300.323. The IEP team must review a child's IEP, at a minimum, annually to determine whether the annual goals for the child are being achieved. *Id.* § 300.324; *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1177 (11th Cir. 2014). An IEP may be amended via an IEP team meeting, but the child's parents can consent to amend the IEP without an IEP meeting. *K.A. ex rel. F.A. v. Fulton Cnty. Sch. Dist.,* 741 F.3d 1195, 1206 (11th Cir. 2013). A school board must take steps to

ensure that one or both parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate. *A.L. v. Jackson Cnty. Sch. Bd.,* 635 F. App'x 774, 779 (11th Cir. 2015); *see* 34 C.F.R. § 300.322(a).

Here, on August 12, 2022, A.W. met with AP MacGregor to discuss John's allegation that on the day prior, Sarran and AP MacGregor hit John with a stick. Doc. 134-9 at 104:5-7. On August 19, 2022, A.W. escalated her complaint to the school district and complained that AP MacGregor and the school staff were not following John's IEP and that AP MacGregor hit John with a stick. Doc. S-135-5 at 20. The same day that A.W. escalated her complaint to the school district, ESE Staffing Specialist Amanda Bigwood contacted A.W. via phone and email to suggest to A.W. that an IEP meeting take place. Doc. S-135-5 at 20; Doc. 146 ¶ 22; Doc. S-135-5 at 22. However, A.W. declined the staffing specialist's offer to initiate an IEP meeting. Doc. S-135-5 at 22. Instead, A.W. informed that she would initiate the IEP meeting when she was ready to do so. *Id.*

HCSB did all that it could reasonably do to effectuate a meeting, to wit: the staffing specialist called A.W., offered a date on which to conduct the meeting, provided A.W. with contact information to schedule an IEP meeting, and sent A.W. a follow-up email. *See* Doc. S-135-5 at 22. Therefore, after HCSB had done all it could be reasonably expected to do to conduct an IEP meeting, the ball was in A.W.'s court to respond appropriately so the meeting could take place. Instead, it is unreasonable for A.W. to tell school board staff that she would set up the meeting when she is ready,

and then represent to the Court that it is HCSB's fault that a meeting did not occur in a timely manner. The Court concludes that HCSB took the appropriate steps to ensure A.W.'s presence at an IEP meeting and afforded A.W. the opportunity to participate by offering to conduct an IEP meeting. *See I.S. by & through M.S. v. Fulton Cnty. Sch. Dist.*, No. 23-13456, 2024 WL 4635026, at 5 (11th Cir. Oct. 31, 2024), cert. denied, 145 S. Ct. 1931, 221 L. Ed. 2d 668 (2025) (finding that, even though the school district ultimately rejected the parents' preference, the parents had been given a sufficient opportunity to participate in the IEP process when the parents had attended two IEP meetings, voiced their preferences, and the record indicated the other members of the IEP team seriously considered the parents' concerns and preferences).

Moreover, Plaintiffs concede that an IEP meeting occurred but argue that the delayed nature of the meeting caused a denial of rights. Doc. 142 at 23-24; Doc. 142 at 23; Doc. 134-9 at 105:5-106:2. The Court is not convinced by this argument. First, Plaintiffs did not cite to, and the Court has not discovered, any authority to support Plaintiffs' contention that the IEP meeting was so delayed that the delay was, in effect, a denial of Plaintiffs' rights. Instead, IDEA only mandates that an initial IEP meeting occur 30 days after a child needs special education services. 34 C.F.R. § 300.323. Here, the IEP meeting that occurred on September 19, 2022 was not the initial meeting, as there was already an IEP in place for John. Doc. 146 ¶ 6; Doc. 134-9 at 90:25-92:14; *see also* Doc. S-135-5 at 20. Once the initial IEP meeting has taken place, there is no regulation mandating a deadline by which any subsequent IEP meetings must occur.

Further, Plaintiffs have not directed the Court to any record evidence demonstrating that A.W. requested an IEP meeting. Instead, HCSB suggested the meeting, and, in response, A.W. indicated she would set up the meeting. Doc. S-1135-5 at 22. It is illogical for A.W. to, on her own accord, delay the scheduling of an IEP meeting, only to represent in legal proceedings that the delay caused her rights to be denied. Finally, on August 19, 2022, A.W. initiated contact with the school district to complain that the staff was not following John's IEP, and the IEP meeting took place on September 19, 2022. Doc. S-135-5 at 20; Doc. 134-9 at 105:5-106:2. Therefore, even if the Court construes A.W.'s initial complaint to the school district as an initial determination that John needed special education services[27], the IEP meeting occurred within the 30-day deadline.

The Court now moves to Plaintiffs' contention that HCSB failed to conduct a manifestation hearing. A manifestation determination review is required within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct. 20 U.S.C.A. § 1415; 34 C.F.R. § 300.530. A "change of placement" occurs if the child is removed for more than 10 consecutive school days, or the child has been subjected to a series of removals that constitute a pattern because: 1) the series of removals totals more than 10 school days in a school

[27] The Court does not view A.W.'s complaint as an initial determination of John's need for special education. The record is abundantly clear that John's IEP was already in place when John started attending Explorer K-8. Doc. 146 ¶ 6; 134-9 at 90:25-92:14; 119:4-9; 123:12-17; *See also* Doc. S-135-5 at 20.

year; 2) the child's behavior is substantially similar to the child's behavior in previous incidents that resulted in a series of removals; and 3) additional factors such as the length of each removal, the total amount of time the child has been removed, and the proximity of the removals to one another. C.F.R. § 300.536. "Educational placement" refers to a child's educational program and not to the particular institution where that program is implemented. *Hill By & Through Hill v. Sch. Bd. for Pinellas Cnty.*, 954 F. Supp. 251, 253 (M.D. Fla. 1997), aff'd sub nom. *Hill v. Sch. Bd. for Pinellas*, 137 F.3d 1355 (11th Cir. 1998). Even if a child is transferred to a different school, if the child's IEP does not change, then there has been no change in the child's educational placement. *See id.*

In the instant case, HCSB was not required to conduct a manifestation review hearing. First, a manifestation hearing was not required because Plaintiffs have failed to direct the Court to any evidence that shows a "change of placement" occurred to trigger a manifestation hearing. Namely, HCSB did not change John's school placement, educational program, or IEP. Instead, John was merely suspensed for one day. Doc. S-135-3. Moreover, even if this Court accepts as true that a "change of placement" occurred, a manifestation hearing still would not be required because HCSB did not remove John for more than 10 days; instead, as alleged by Plaintiffs, he was removed from class on three, separate days, and he was suspended for one day.[28]

---

[28] Plaintiffs did not direct the Court to the pincite(s) in the record showing that John was removed from class on August 11, August 12, and August 18, and suspended after the box cutter incident. *See Chavez*, 647 F.3d at 1061 ("Making district courts dig through volumes of

The three removals and one suspension did not constitute a pattern of removals because they did not total more than 10 days in a school year. In conclusion, no reasonable jury could find that HCSB discriminated against Plaintiffs by not conducting an IEP hearing or manifestation hearing.

**E. Remaining State-Law Claims**

Negligence against HCSB (Counts 5-6), battery against AP MacGregor and Ms. Sarran (Counts 1-2), and intentional infliction of emotional distress against AP MacGregor and Ms. Sarran (Counts 7-8) are the state-law causes of action pled in the Fourth Amended Complaint. Doc. 123. Because the Court will dismiss the federal claims with prejudice, only the state-law claims will remain. The Court will decline to exercise supplemental jurisdiction over those state-law claims. 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). As the Eleventh Circuit has recognized, where a court's decision "eliminates all federal claims in this case, leaving only Plaintiff's state-law

documents and transcripts would shift the burden of sifting from [the parties] to the courts."); *see also A.L.*, 635 F. App'x at 786-87 ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record.") However, HCSB did not contest these facts. Therefore, viewing the evidence in the light most favorable to the Plaintiffs, the Court accepts as fact that John was removed from class on three separate occasions and suspended after the box-cutter incident.

claims," the district court is permitted discretion, under the *Gibbs* doctrine, to decide whether to consider Plaintiff's state-law claims. *Hicks v. Moore*, 422 F.3d 1246, 1255 n.8 (11th Cir. 2005); *see also United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) ("Certainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004) ("The decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court. We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.") Upon consideration, and given that the remaining claims present issues of state-law, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims. Therefore, the Court will dismiss those claims without prejudice.[29]

Accordingly, it is hereby

**ORDERED**:

[29] The period of limitations for any claim asserted under subsection (a) [establishing supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d). Section 1367(d) "protects plaintiffs who choose to assert supplemental state-law claims in a federal action. If the court declines to exercise supplemental jurisdiction over those claims, the plaintiff may assert them in a new action in state court without fear of being barred by the statute of limitations. This obviously protects plaintiff when state law might not have provided for tolling during the pendency of the federal-court case." 13D Charles Alan Wright et al., Federal Practice & Procedure § 3567.4, 458–59 (3d ed. 2008).

1. Defendant Hernando County School Board's Motion for Summary Judgment (Doc. 136) is **GRANTED-IN-PART** as to the federal claims in Counts 3, 4, 9, 10, 11, and 12.

2. The Clerk is directed to enter Judgment in favor of Defendant, Hernando County School Board, and against Plaintiffs, John Doe and A.W., as to the federal claims in Counts 3, 4, 9, 10, 11, and 12.

3. The Court declines to exercise supplemental jurisdiction over the state law claims against Hernando County School Board in Counts 5-6 (Intentional Infliction of Emotional Distress) of the Fourth Amended Complaint. Counts 5 and 6 are dismissed without prejudice.

4. The Court declines to exercise supplemental jurisdiction over the state law claims against individuals Andrew MacGregor (Count 1 – Battery, Count 8 – Intentional Infliction of Emotional Distress) and Sabreena Sarran (Count 2 – Battery, Count 7 - Intentional Infliction of Emotional Distress) in the Fourth Amended Complaint. Counts 1-2 and 7-8 are dismissed without prejudice.

5. The Clerk is further directed to terminate any pending motions and deadlines and close this case.

**DONE AND ORDERED** in Tampa, Florida on September 25, 2026.

Charlene Edwards Honeywell
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any